I would like to start with a discussion of the disability case of Mr. Buck as it respects the fifth and the last phase of a disability assessment. As you know, the Social Security disability analysis involves a five-step process. At the fourth and fifth step of the disability process, there's questions about whether an individual can do their past work and if they cannot, whether or not they can do any other work that exists in significant numbers in the national economy. And first of all, I'm directing my attention to the RFC was an ability to perform exertional work at all levels, whereas of April 24, 2012, the exertional requirements were reduced to work at the light exertional level. That eliminated past work done by Mr. Buck, so the analysis is simply that of the fifth and last step. Six jobs were identified at the fifth step, three at the light exertional level, three at the sedentary level. The government has conceded that the sedentary jobs are inapplicable and not appropriate in this case based upon the limitation to simple routine and repetitive work. The three sedentary jobs require more than what is stated in the RFC. That leaves the four light level jobs. Now, a post-hearing submission was given to the ALJ indicating the testimony of the vocational expert at the hearing was mistaken and that the jobs that were testified to by the vocational expert at the hearing was not accurate. Can you educate me a little bit on that process? Because it really struck me, the great discrepancy between your numbers and the vocational expert's numbers. And so how did that happen? Because I'm assuming that both the vocational expert, the ALJ, and then you essentially compiled these numbers from the same sources. Explain to me a little bit why there's such a great discrepancy. And then we can talk about what the ALJ is supposed to do under that circumstance. In order to answer that question, we first must understand that there's no published data in this country about the availability of job numbers by discrete DOT code. 20 CFR 404 1566 requires that job numbers be given for discrete DOT codes. And if that job number data does not exist at the federal level, then we have to rely on other sources to get that data. What happens is the Bureau of Labor Statistics, which is the source of job numbers in the United States, publishes job numbers by what are referred to as either SOC codes or OES groups, which is a number, it's a large group of jobs with varying skill levels and exertional levels in which a particular job may fall. The job numbers for the group, for the whole group, not for an individual job. The information that was used in this case is from a private vended software program called Job Browser Pro. When you say used, you mean used by the VE? Yes, the VE testified that she used Job Browser Pro as the source of her numbers. We have the same program. We use it ourselves. And so when we got... That's what I'm trying to understand. So the VE basically went to this browser and then compiled the statistics, but you went to the same source. Yes. And the numbers are so different. I'm just trying to understand how that happened. Well, what happened is that rather than use the numbers for the discrete DOT code, she used numbers for the OES group. That's where the variation comes in. She's using numbers from a much larger group of jobs rather than a specific job that was named by the VE at the hearing. You argue this in your brief, you know, but is that something you can take judicial notice of? Well, here's the problem, and this is what we're asking you to take another look at, and that's the Bayless case this court decided in 2005. The Bayless case recited that the expertise of the VE provides the foundation for the VE's testimony. The problem is that the word reliability, which is in that decision as part of that same phrase, is too often disregarded or overlooked. ALJs essentially don't listen to, don't care about, or don't want to hear about information about job numbers that's different than what's testified to by the VE at the hearing. And the question is, is the reliability factor is being disregarded. We're asking this court to clarify the decision that the issue of reliability is essential in the issue of job numbers. And in this particular case, you can say, well, your numbers are different than the VE's numbers, but at the end of the day, even though these numbers that we provided were given to the judge before the decision, he didn't pay any attention to them. He didn't mention them, he didn't consider them. So he gave you an opportunity to provide further submission, right? Right. But the decision ultimately was silent on how he reconciled the discrepancy. He didn't reconcile it. He didn't mention it. He didn't do it. What rule are you advocating as a clarification or a list that if the numbers provided by the vocational experts being challenged and the ALJ has to reconcile it in some way, is that the proposed rule? Well, no. The general rule, and it applies to all cases, is the ALJ must consider all evidence that comes before him or her. And in this particular case, the information we provided about the discrepancy between the VE testimony at the hearing and what we did using the same program that was used by the VE simply wasn't considered, even though... Here's my problem with what you've done in this case, is that, you know, this is all in your brief. I'm not sure it's subject to judicial notice. You didn't put on an expert of your own, so there's nothing in the record on it. And you're asking us to sort of, you know, accept the factual basis of your argument in your brief is sufficient, right, to overcome the vocational experts' finding. Well, first of all... Right? Is that what it amounts to? No. First of all, the information that we cited in our brief is an exhibit in the record and it was submitted to the judge before the decision. This was information available to the judge before the decision. And at the end of the day... But considerably after... Excuse me? Considerably after the evidence closed, right? It was a post-hearing file. Well, no. You can submit additional information to a judge all the way up to the time of the decision. There's no bar to that. But what I was going to answer your question about, you said no expert of our own. But if you submit information to a judge, that whether it's from the attorney or whether it's from a vocational expert, what difference does the source make if the information is not going to be considered? In the decision, the judge made it perfectly clear that he wasn't considering that information. It wasn't mentioned. It wasn't discussed. And a footnote in his decision on page 10 of his decision, footnote three, he very clearly makes it... That it's his position that once the VE is qualified, that's the end of the inquiry. And so it doesn't matter if additional evidence is submitted to... That's contrary to the VE. It doesn't matter. He's not going to consider it. Now before the date that the RFC changed, we have the issue of... How do we know that the ALJ didn't consider it? I mean, he didn't reconcile the discrepancy, but didn't the ALJ during the hearing indicate to you during the cross-examination of the submission on this issue, post-hearing submission? Isn't that what prompted the post-hearing submission? I think we mentioned it. We mentioned it to the judge that something along these lines would be submitted. I don't recall a specific conversation that's in the hearing, but I'm sure it came up as an issue. But the judge was clear in that once a vocational expert is qualified as an expert, any inquiry into their testimony about job numbers is basically irrelevant because the fact of their expertise qualifies their testimony about job numbers. And as I said before, if the information is not going to be considered, it's irrelevant as to who the source is. Now before the date that I mentioned, April 24, 2012, the judge ruled that the claimant had the ability to return to past relevant work, which was listed in the decision. But the evidence in this case shows that Mr. Buck has never been able to hold down a job of any sort with any degree of reliability or consistency, with the exception of the Pioneer job, which was lasting 17 months, and which is basically a sheltered workshop situation because what they do is they take in people with disabilities or people who are on referral to the, from the Department of Corrections. And unfortunately Mr. Buck has had issues where he's been incarcerated for periods of time. But the issue in that regard is the fact that while it's claimed that he can do this work, he's never demonstrated any ability to do work at this length of time. And that raises the issue of one of the diagnoses or one of the severe conditions defined by the judge, which was a personality disorder. As we outlined in our briefing material, there's 21 different personality disorders under that umbrella. And he has an antisocial personality disorder, which makes work very difficult because he simply can't get along with people on the job or generally. As a result of that, that's the incarcerations, that's the getting fired from every single job that he's ever had. So with that, I'll reserve the rest of my time, unless there's some questions that you have. Thank you, Counsel. Your Honors, may it please the Court, Jeff McClain on behalf of the Commissioner of Social Security. Before turning to the specific assignments of error, I think it's worth noting in this case that the LGA's decision was supported by substantial evidence, including the medical expert testimony of Dr. Louie and Dr. Tose, as well as the treatment record, which documented improved functioning on medication. Mr. Buck also reported during the period at issue that he liked working on computers and did odd jobs for cash for his friends. Beginning with the step two, which was the last issue that plaintiff's attorney discussed, the LGA reasonably resolved step two in Buck's favor, including finding an ADHD, bipolar disorder, and personality disorder severe. Although the LGA only stated personality disorder in the bolded finding, the narrative that followed that discussion mentioned the antisocial personality disorder that was discussed. So the LGA was well aware of the nature of Mr. Buck's personality disorder in rendering the decision. Going to the step five jobs issue, the LGA reasonably evaluated the vocational evidence in this case in reaching a conclusion at step five. The LGA identified the bottling line attendant, bottle packer, and conveyor belt maker positions, and they existed in significant numbers. With regard to plaintiff's challenge to the job numbers, the LGA absolutely considered that challenge. There was a discussion on the record at the hearing about the issue of the job numbers. The LGA opened the record, or left the record open for further submissions on the topic. And in reaching the decision the LGA stated on page 437, I note that while Mr. Talbot takes issue with various aspects of the vocational expert testimony, Ms. Longacre's expertise establishes a foundation for my conclusions. That analysis is in line with the Bayless case, and this set of facts I don't think provides any reason to change that analysis. Under Bayless, an ALJ may take administrative notice of any reliable job information, including the testimony provided by a vocational expert. And the reliability issue is supported by the VE's recognized expertise. Therefore, the ALJ is free to analyze the... Let me clarify your position. You're not bothered by the inquiry where Judge Tashima is going, that whether this was something that was before the ALJ. Your argument is that the evidence submitted in that post-hearing filing by Petitioner's Counsel was before the ALJ, and the ALJ took that into consideration. Do I understand your argument correctly? I would phrase it, yes. I believe that's my basic assertion. The evidence from job browsing... If that is your assertion, explain to me again how we know that the ALJ actually took the VE, is so large, so stark, that when the ALJ is silent on it, how do we know that he actually considered it? It seemed to me that the record can be read as the ALJ took what the VE said, and under the Bayless case said, well, that provides sufficient foundation. I'm going to take these numbers, versus saying, wow, these numbers are really different. Here's why I'm accepting the vocational experts' numbers, despite the fact that the numbers presented by Petitioner's Counsel are very different. It's true that the ALJ did not delve into the issue in the written decision. However, what's explained in the decision, and what has been considered by the ALJ, is not necessarily the same. There's no law or requirement that Mr. Talbot cites, or that I'm aware of, that requires the ALJ to provide further explanation than is given here. The ALJ acknowledged the existence of the arguments. The ALJ was aware of the entire record. And I think it's reasonable to infer the ALJ, therefore, considered the arguments that were put forward. And the issue of whether or not this was properly before, I think, goes to a matter of weight. Mr. Talbot provided his own analysis, his own lay analysis of the job numbers, which runs up against the vocational expert analysis of the job numbers. Mr. Talbot did not provide vocational experts' interpretation of the issue, which would have been a much more serious challenge to the findings of the vocational experts. We have the same judge, both in Bush 1 and Bush 2, right? Yes, it was Judge Stethoff. Was that issue addressed at all in Bush 1, in the first one? The first time around, the issue was not before the Court, because the case was resolved at In this case, there was a Step 4 finding covering the period before April 12, 2012. And then afterwards, the case turned to Step 5. Another way of looking at this problem is to say that at most, a reasonable interpretation of the job numbers is offered by Mr. Talbot, but that there's no reason that the vocational experts' testimony or reliance on that testimony was not also reasonable by the ALJ. The ALJ served the function of taking evidence, making findings, noting the objections of Mr. Talbot, and moving forward to draw reasonable conclusions. I think no more was required by the ALJ in this case. Can you address the rejection of Dr. Kenderdine's, the examining physician's opinion? Absolutely. So the ALJ offered two reasons with regard to Dr. Kenderdine. The first reason was that the opinion was based at least in part on non-credible subjective reports. The second reason was that the ALJ, or was that Dr. Kenderdine's opinion was based on Dr. Kenderdine, failed to consider the possibility of symptom exaggeration reflected in the claimant's score on the Beck Depression Inventory. Those are both valid bases and specific and legitimate reasons for rejecting Dr. Kenderdine's conclusions. Those conclusions were also supported by the medical expert testimony of Dr. Tose. Dr. Tose in particular noted that the scores on the Beck Depression Inventory were so high as to be invalid and possibly suggestive of symptom exaggeration. So not only did the ALJ provide his own valid interpretation of Dr. Kenderdine's opinion in rejecting Dr. Kenderdine's conclusions, ALJ's interpretation of that evidence was also supported by medical expert testimony. Well, Dr. Kenderdine also did a clinical interview and a mental health or mental status evaluation, right? Yes, he did. So are those objective measures? Those are objective findings, Your Honor. And so is that conclusion for rejecting his testimony or opinion supported by substantial evidence when the self-report is essentially buttressed by objective findings? Well, I would say there's a difference between a mental status examination that's been conducted and what the findings on mental status examination were. So the findings on mental status examination from Dr. Kenderdine were mixed. With regard to social functioning, Dr. Kenderdine noted that Buck was cooperative on examination with intact logical and goal-directed thought processes. Dr. Tose testified that there was a conflict between the clinical exam and the findings of Dr. Kenderdine. He noted that Dr. Kenderdine identified that Buck completed a complex task on examination, but that he nevertheless found Buck was markedly limited in his ability to follow complex instructions. So in the court, when the ALJ is faced with a mental status examination that may not necessarily explain the degree of limitation in the medical opinion, that's the basis for concluding that subjective Moreover, the ALJ identified specific... But what's wrong with that? Isn't that the nature of psychiatry? It's always going to depend in part on subjective reporting of symptoms. There's a range of situations when you're confronted with a psychologist's opinion. And very frequently, psychologists conduct a mental status examination. They do the clinical interview. They're absolutely discussing the subjective complaints with the claimant. However, there's a gradation when you're looking at what the relationship between the objective findings are to the opinion rendered. For example, if you had, and this is not the case before us, but if you had a mental status examination with completely normal findings, but then you turned and had an opinion where there were marked and severe restrictions, you could say, well, there's a conflict between those two things, and you have to infer, or could infer, that subjective complaints played a role in the decision of the psychologist. You can also have a situation where the objective findings fully support the conclusions of the psychologist. Thereby, you say, well, the objective findings were enough on their own to make that decision and to uphold and conclude that the valid conclusions of the psychologist were there. This is a middle situation where the objective findings were mixed, and yet there were some that suggested the individual was not as limited as Dr. Kenderdine opined. In that situation, as the LJ concluded, there is a basis for saying that the subjective complaints were in part a basis for reaching his decision, or reaching his opinion. The second reason offered by the LJ also provided support for the LJ's analysis. He determined that based on Dr. Toh's testimony, that there is evidence of possible symptom exaggeration, and that an instrument relied on by Dr. Kenderdine was in fact invalid, even though Dr. Kenderdine did not find it to be. That's a separate basis for finding that the opinion of Dr. Kenderdine was not supported, and another way to uphold the LJ's decision on Dr. Kenderdine. Thank you. If there are no further questions. Thank you very much. Judge Walter, in response to the question you asked counsel, in the first hearing in the case, there was no vocational expert. So there was no discussion about job availability, because we didn't even get to step five of the sequential evaluation process. What is important about that decision, however, is that Judge Strombaum reversed that case and sent it back for a new hearing because the judge failed to consider the testimony and the evidence of Dr. Kenderdine. And basically that's what we're saying here, is we have an ALJ that failed to review the information that was provided to him after the hearing. Have you been reversed the first time, or do you think he just said it in your ear? The second time? Well, the second time we actually had vocational testimony. And what's interesting is, I'll quote from the judge's decision. It says, I note that while Mr. Talbot takes issue with various aspects of the vocational expert testimony, Ms. Longacre's expertise establishes a foundation for my conclusions. So he's not directly addressing the data that was submitted to him. And in the footnote, it says the testimony of the vocational expert is sufficient to establish that jobs exist in significant. Wait, wait, he goes on to say, based on the testimony of the vocational expert, I conclude that considering the claimant's age, education, work experience, residual functioning capacity, the claimant is capable of making a successful adjustment. In the other word. So he didn't just say the expert laid down his hand and that's all I need. He considered other things. What he did, though, is he said he based that sentence on what's directly above it and the six jobs that are identified. And so what he's concluding is he's summarizing by way of a conclusion that based on the six jobs that are listed above, I'm finding that the claimant can do work that exists in significant numbers. One relates to the other. Well, what's important is then the footnote, it says that the vocational, the testimony of the vocational expert is sufficient to establish that jobs exist in significant numbers in the national economy. The recognized expertise provides the necessary foundation for his or her testimony. Quoting the Bayless case, it doesn't say at all that the judge considered the data that was submitted to him. And as I said before, he's leaving out the reliability aspect of testimony of a vocational expert. He's simply saying if somebody comes in and they're a vocational expert, that's enough for me. Whatever they say is good. But that isn't what he did according to the body of his opinion, right? Well, but it's like when Judge Strombaum reversed the first appeal based on the lack of consideration of Dr. Kenderdine's testimony. We're saying the same thing. If the judge wants to examine our testimony and say, I don't accept it, it's disregarded or whatever the rule is, that's fine. He's accepted it or he's looked at it. But he can't disregard it, and he disregarded it because it's not mentioned in this case. Now, as far as Dr. Kenderdine is concerned . . . he doesn't have to affirmatively address every piece of evidence that has been introduced and to say I accept it or reject it. Isn't that the rule? Well, I don't think that's the rule. I think that takes us in a dangerous direction because if a judge is free to pick and choose without regard to talking about evidence, then we have really problematic kinds of decisions. Are you advocating a rule that then the ALJ has to address every piece of evidence introduced at the hearing? It depends on what the evidence is. And I know some of the cases you're referring to talk about the lay witness statements or lay witness testimonies introduced by way of written statements. And the cases say, well, you don't have to talk about every one of them. But in this particular case, when we have such a crucial piece of evidence, it should at least be considered whether the judge would agree with it or not is a different issue. And by the way, with respect to Dr. Kenderdine, we submitted a post-hearing sworn statement from Dr. Copeland, who's also a psychologist, that talks about the Beck inventory scores and that the conclusion of the Emmy at the hearing about the Beck inventory scores as being too high and being improper is not supported anywhere in the medical literature. It just isn't. And that was the linchpin upon which the judge rejected the testimony of Dr. Kenderdine or the evidence from Dr. Kenderdine. That was a post-hearing submission? It was. I see my time is up. Thank you. Yes, our questioning has taken you over your time, but we appreciate your arguments from both sides of the matter. Submit it for a decision.
judges: Tashima, Nguyen, Walter